**James P. TAYLOR, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. 4–60 Civil 308.**

United States District Court
D. Minnesota,
Fourth Division.

Nov. 1, 1961.

---

George G. McPartlin, St. Paul, Minn., for petitioner.

John J. Connelly, Asst. U. S. Atty., Minneapolis, Minn., for U. S.

DEVITT, Chief Judge.

James P. Taylor, hereinafter referred to as the Petitioner, was the defendant in United States of America v. James Peter Taylor, Criminal No. 8746. On March 28, 1959, Petitioner moved this Court under Title 28 United States Code, § 2255, for an Order vacating sentence imposed upon him on July 5, 1956, following judgment of conviction on his plea of guilty to killing a person in attempting to avoid apprehension for bank robbery and to interstate transportation of travelers checks stolen, converted and taken by fraud, and interstate transportation of counterfeit travelers checks. Various grounds were alleged in support of this Motion, including the allegation that the Petitioner was mentally incompetent during all the proceedings before the District Court leading to his conviction and sentence.

On June 18, 1959, this Court denied Petitioner's Motion in all respects without a hearing. The Petitioner appealed to the United States Court of Appeals for the Eighth Circuit. That Court, by its decision of July 29, 1960, 282 F.2d 16, 24, upheld this Court in all respects save one: The Circuit Court held that the Petitioner was entitled to a hearing on the question of whether he was mentally competent during the proceedings against him in the District Court. The Court of Appeals by its mandate of August 24, 1960, directed that Petitioner be granted a hearing on his Motion to vacate judgment and sentence insofar as said Motion alleged Petitioner was mentally incompetent during the proceedings against him in the District Court.

On October 27, 1960, this Court ordered that the Petitioner be given a hearing by the Honorable Edward J. Devitt, Chief Judge, on the allegation in his Motion that he was mentally incompetent during the proceedings against him in the United States District Court for the District of Minnesota, and accordingly the Petitioner appeared before this Court on July 10, 11, and 12, 1961, at the hearing on said motion.

In advance of the hearing, Mr. George McPartlin, St. Paul, Minnesota, a prominent member of the Minnesota State Bar, was appointed to represent Petitioner and he appeared in behalf of Petitioner at the hearing on said motion. At the hearing, John S. Connolly, an attorney at law, of St. Paul, Minnesota, appeared on behalf of Petitioner as amicus curiae. The United States of America was represented by John J. Connelly, Assistant United States Attorney.

Prior to the above hearing and on May 17 and June 12, 1961, Petitioner appeared in Court with his counsel and Petitioner offered his sworn statements in support of his request for subpoenas for certain witnesses to testify in his behalf.

At the hearing the following persons were subpoenaed and testified in Petitioner's behalf: Walter Riordan, Attorney at Law, of Minneapolis, Minnesota; Dr. R. Settle and Dr. John Dickinson, Warden and Staff Psychiatrist, respectively, for the Medical Center for Federal Prisoners, Springfield, Missouri; Dr. Leo Vitvick, Hennepin County Jail Chaplain, Minneapolis, Minnesota; Rev. John Onan, Minneapolis, Minnesota; Douglas Stromberg, former cellmate of Taylor in 1956 in the Hennepin County Jail; and Robert Allie and James Redpath, United States Deputy Marshals, Minneapolis, Minnesota. The Petitioner's hospital records at Ancker Hospital, St. Paul, Minnesota; the Psychological Examination Report of Petitioner by George A. Giel, Clinical Psychologist, Medical Center for Federal Prisoners, Springfield, Missouri, and Petitioner's Parole Application of 1954 at the United States Reformatory, Terre Haute, Indiana, were subpoenaed and offered in evidence on Petitioner's behalf.

The Court, after hearing the testimony of the witnesses and considering the statements made by Petitioner, and the statements and arguments of counsel, and having examined all the records, files, proceedings, exhibits and medical records, and having considered the matter and being fully advised in the premises, makes the following:

## Findings of Fact

### I

That no claim that Petitioner was mentally incompetent was made during any of the proceedings leading to his conviction and sentencing on July 5, 1956 in Case No. 8746 Cr. in the United States District Court, District of Minnesota, or before March 28, 1959, when Petitioner filed his motion under Title 28 United States Code § 2255.

### II

On December 8, 1955, Petitioner was arrested at Joplin, Missouri. He was subsequently removed to Minneapolis, Minnesota, on a warrant issued on a Commissioner's complaint charging violation of Title 18 United States Code §§ 2113 and 2314, and he was there confined in the Hennepin County Jail where he remained until July 12, 1956, when he was taken to the Federal Penitentiary at Leavenworth, Kansas.

### III

On December 15, 1955, Petitioner first appeared before this Court, at which time he requested the Honorable Gunnar H. Nordbye to appoint one of the following three lawyers to represent him, to wit: A. Jerome Hoffmann of St. Paul, Irving Nemerov of Minneapolis, or Sydney W. Goff of St. Paul, Minnesota. When referred to herein "the Court" refers to the Honorable Gunnar H. Nordbye, unless otherwise indicated. Judge Nordbye appointed Irving Nemerov of Minneapolis, one of the attorneys requested by the Petitioner, to represent him as attorney in the Criminal No. 8746. On December 20, 1955, Petitioner was before this Court with his Court-appointed counsel and waived preliminary hearing. On February 2, 1956, an indictment in Case No. 8746 Criminal, United States District Court, District of Minnesota, was filed charging defendant with violating principally Title 18 United States Code §§ 2113 and 2314. On February 6, 1956, at the request of Mr. Nemerov, Judge Nordbye appointed Walter Riordan, attorney at law, of Minneapolis, Minnesota, as additional counsel to assist Mr. Nemerov.

### IV

On February 6, 1956, Petitioner appeared before the Court with his counsel and entered a plea of not guilty to all counts of the Indictment. On March 26, 1956, the Petitioner appeared in Court with both of his counsel and counsel then and there requested a continuance of the trial. On March 29, 1956, Petitioner appeared in Court with his counsel seeking a subpoena duces tecum for all statements made by any of the Government witnesses.

### V

On April 6, 1956, Petitioner appeared personally before the Court, with both of his counsel, and requested the Court to change his plea from not guilty to guilty on all counts. Each count of the Indictment was read and Petitioner personally entered a separate plea of guilty to each count. Thereafter, Judge Nordbye fully explained to Petitioner the consequences of entering such pleas to the four counts of the Indictment and informed Petitioner that by entering a plea of guilty to each count, the Petitioner admitted being guilty of each and every element of the crimes alleged in the Indictment, and further advised Petitioner that if the plea of guilty were permitted to stand there could be no reservation as to the full import of Petitioner's plea of guilty. Petitioner was further fully advised by the Court that it was within the absolute right and discretion of the Court to determine whether a jury should be called to determine the question of the death penalty on Petitioner's plea of guilty to Count I, and that likewise the Court without a determination by a jury could impose sentence on Count I of not less than 10 years and up to life imprisonment. On this occasion the Petitioner fully and completely understood the Court's statement of his rights and the full import and possible consequences of his pleas of guilty, and the Court accepted the pleas of guilty only after it was satisfied that the Peti-

tioner fully and completely understood all of his rights in connection therewith and the full import and possible consequences of his plea of guilty.

### VI

After petitioner's plea of guilty and before his sentence in the District Court, the Court directed the Federal Bureau of Investigation to investigate Petitioner's background, medical history, and prior offenses and make a report to the Court to assist it in determining the sentence which should be imposed on the Petitioner.

### VII

On April 9, 1956, the Petitioner gave a detailed oral statement to Agents of the Federal Bureau of Investigation regarding the offenses with which he was charged and to which he had entered pleas of guilty. The statement was given freely and voluntarily by Petitioner in the presence of his counsel, and when transcribed consisted of 41 typewritten pages. The statement is clear, well organized, intelligent and coherent. On April 9, 1956, the Petitioner had a clear recollection of the facts surrounding the offenses with which he was charged in the Indictment in Criminal No. 8746; he had the mental ability to relate them clearly and intelligently in his own fashion without assistance; and he was well aware of the nature and severity of his offenses.

### VIII

On June 6, 1956, the Petitioner appeared in Court with both of his counsel and the Court heard argument by the United States Attorney and by both of Petitioner's counsel on the motion of the Government to empanel a jury to consider the punishment for the capital offense. The motion was later withdrawn.

### IX

A copy of the pre-sentence report of the Federal Bureau of Investigation to Judge Nordbye was delivered to counsel for Petitioner prior to his sentencing.

### X

On July 5, 1956, Petitioner appeared before the Court for sentencing; prior to the imposition of sentence Petitioner made an oral statement to the Court, copy of which statement is attached hereto marked Exhibit "A" and made a part of these Findings; and Petitioner's counsel both made oral statements to the Court in behalf of the Petitioner. At this time Petitioner and both of his counsel were thoroughly familiar with Petitioner's past medical history but never made any claim that Petitioner was insane or mentally incompetent.

### XI

At all times from April 6, 1956, when he entered his pleas of guilty to all counts in the Indictment, to July 5, 1956, when he appeared before Judge Nordbye for sentencing, the Petitioner fully understood the nature of the proceedings against him and the import and consequences of his pleas of guilty to the several counts of the Indictment.

### XII

During the proceedings before the Court in 1956, no claim was made by Petitioner or his counsel that Petitioner was unable to understand the proceedings against him, or effectively to assist his counsel in his own defense. There was a statement that Petitioner had requested but did not receive, psychiatric treatment while incarcerated at Terre Haute. However, no one contended that because of the failure of the Government to provide psychiatric treatment, or because of any other reason or condition, that Petitioner was so mentally incompetent that he was unable to understand the nature of the proceedings against him or that he was unable effectively to assist his counsel in his defense of those charges.

### XIII

Following the plea of guilty, counsel for Petitioner requested the Court, as part of the pre-sentence investigation, to appoint three psychiatrists to examine the Petitioner primarily in order to de-

termine whether he was suffering from any injury to his brain, as Petitioner claimed he had in the past sustained several cerebral concussions. The Court acceded to this request and appointed three eminent psychiatrists, Drs. H. B. Hannah, V. Richard Zarling, Minneapolis, and Dr. Wm. H. Hengstler of St. Paul, to make said examination. These Court-appointed psychiatrists in May, 1956, spent about ten hours, more or less, with Petitioner in obtaining information from him and from other sources as to his background and medical history and making the psychiatric examination. Two electroencephalograms were made, using an electrically operated machine that diagnoses the existence in the subject of organic brain damage. The psychiatrists also reviewed information obtained by the Government and various hospital records pertaining to Petitioner. On May 21, 1956, the three psychiatrists filed a unanimous report of their examination with the Court, a copy of which is attached hereto, marked Exhibit "B" and made a part of these Findings. At the time of said examination Petitioner had no residuals of intracranial injury or brain damage and Petitioner was not then suffering from any mental or intellectual impairment indicating such residuals or brain damage. At that time the three psychiatrists made no written findings as to whether Petitioner was mentally competent to understand the proceedings against him or to assist in his defense.

## XIV

The three psychiatrists examined the Petitioner in May of 1956, primarily in order to determine whether he was suffering from any injury to his brain, but their examination was of sufficient scope and extent to reveal any mental or intellectual impairment which may have existed in Petitioner from any cause whatsoever, so the three psychiatrists, because of such examination, were competent to express an opinion as to Petitioner's mental competency at the time of the proceedings in the United States District Court, District of Minnesota, in Criminal No. 8746.

## XV

In May of 1956, when Petitioner was examined by the three psychiatrists appointed by the Court, Petitioner was remorseful, regretted his crime normally, had a clear mind and a high intelligence quotient; knew that he might be executed or imprisoned for life, and was also competent to understand his position, to cooperate with his counsel, and to appear at the trial. Petitioner at said time had no symptoms of any mental disorder of any kind; his mental condition was perfectly normal, and it was not necessary to have him examined by a clinical psychologist in order to determine his mental condition.

## XVI

On June 9, 1959, the three psychiatrists who had examined Petitioner in May of 1956, filed a further report with the Court reciting at length the medical history received from Petitioner and that they also had reviewed Federal Bureau of Investigation records, copies of hospital records and the detailed confession by Taylor to the crimes to which he pled guilty. This report is part of the Court's file in No. 4–60 Civil 308. At the time Drs. Hannah, Zarling and Hengstler examined Petitioner in May of 1956, the Petitioner was mentally competent to understand the proceedings against him and to properly assist in his own defense.

## XVII

Petitioner's counsel were thoroughly informed as to matters relating to Petitioner's background, including his medical and neuropsychiatric history. Petitioner's counsel interviewed the three psychiatrists prior to the time of sentencing and after they had completed their neuropsychiatric evaluation of Petitioner.

## XVIII

On July 11, 1961, Petitioner, in open court, waived the privilege of the attor-

ney-client relationship and Walter Riordan, one of the attorneys appointed by the Court in 1956 to represent Petitioner, was subpoenaed at Petitioner's request to testify in Petitioner's behalf at the hearing on the instant motion.

### XIX

Walter Riordan was one of Petitioner's counsel during the proceedings in District Court in 1956. After Mr. Riordan was appointed, and before Petitioner was sentenced, Mr. Riordan visited Petitioner at the Hennepin County Jail for at least 200 hours in 1956 while preparing Petitioner's case. During said period of time Petitioner had access to the telephone in the jail and on occasion called Mr. Riordan at his home; and Petitioner was able, from his own recollection and memory, to relate to said Riordan his past medical history which was later corroborated by the Federal Bureau of Investigation. During the aforesaid period of time, the Petitioner had the mental capability accurately to relate times, places, and things as they related to Petitioner; Petitioner understood that there would be a Judge in charge of the trial, and Petitioner understood all the proceedings which took place in the Courtroom with reference to the Petitioner, that the Judge would be in charge of the proceedings, that there was a prosecutor who was doing his best to convict him, that Mr. Riordan and Mr. Nemerov would undertake to defend him against the charges against him, that he was in the Courtroom in a Court of Justice and charged with a criminal offense; and that Petitioner had the mental capacity to understand and did fully understand that his matter could be presented to a jury which could pass upon the evidence and that, in such event, it would be the function of the jury to decide whether he, the Petitioner, was guilty or innocent; Petitioner was fully advised by his counsel and understood the procedure under Federal Law for submitting the question of the death penalty to a jury in connection with the killing under Title 18 United States Code § 2113; Petitioner fully comprehended the nature and possible consequences of such proceedings and during this period of time possessed sufficient memory to relate in his own manner the details surrounding the offenses he was charged with and at all times during his contacts with his counsel, Mr. Riordan, Petitioner was competent to understand the proceedings against him and to effectively assist his counsel in his own defense. Petitioner was fully advised by his counsel, Mr. Riordan, on the many occasions when he visited Petitioner as to what lay ahead in the way of investigation, presentation to the Court, and the possible consequences; these meetings were two-way exchanges between Petitioner and Mr. Riordan and Petitioner understood said advice; Petitioner on such occasions was able effectively to help analyze and evaluate every piece of evidence his counsel had and the Government's evidence as far as they could acquire it; and in all these discussions Petitioner understood the value of evidence.

### XX

That Mr. Irving Nemerov, attorney at law of Minneapolis, Minnesota, who was appointed by the Court at Petitioner's request to represent him in all proceedings in Case No. 8746 Criminal, is a thoroughly competent lawyer who is well versed and has specialized to a considerable extent in defending persons charged with violation of the criminal law in both State and Federal Courts; that Mr. Nemerov is completely competent to defend a person against the offenses charged in the Indictment in Criminal No. 8746; and that Mr. Nemerov at all times in said case represented the Petitioner as his lawyer in a thoroughly competent and able manner and in strict accordance with the highest ethics and traditions of the legal profession.

### XXI

That Mr. Walter E. Riordan, Attorney at Law of Minneapolis, Minnesota, who was appointed by the Court at the request of Mr. Nemerov to assist him in representing Petitioner in all proceedings in Case No. 8746 Criminal, is a

thoroughly competent lawyer who is especially qualified with respect to medicolegal cases; that Mr. Riordan is competent to defend a person against the offenses charged in the Indictment in Criminal No. 8746; and that Mr. Riordan at all times in said case represented the Petitioner as his lawyer in a thoroughly competent and able manner and in strict accordance with the highest ethics and traditions of the legal profession.

## XXII

On July 11, 1956, the Deputy United States Marshals began the transportation of Petitioner from the Hennepin County Jail, Minneapolis, Minnesota, to the United States Penitentiary at Leavenworth, Kansas. En route Petitioner claimed to be ill and he was taken to the St. Paul City Hospital and he was there examined and placed in the St. Paul Jail over night. The next day he was taken by automobile to the United States Penitentiary at Leavenworth, Kansas. Upon arriving at Leavenworth, he acted unusual and suicide precautions were ordered and his condition then was acute psychotic depressive reaction. This condition first manifested itself in Petitioner on July 11, 1956 and was precipitated by his realization at that time that he faced a life term in prison.

## XXIII

On or about August 23, 1956, when Petitioner was at the Medical Center for Federal Prisoners at Springfield, Missouri, his mental condition was as follows: Schizophrenic reaction, chronic, undifferentiated type with many pseudoneurotic symptoms, chiefly those of autistic thought, paranoid trends, flatness of effect, defect of interpersonal relations, and uncontrolled anti-social and homicidal traits. Petitioner was psychotic in a medical sense but was not legally insane.

## XXIV

On or about August 12, 1943, when Petitioner was in the United States Navy at the Jacksonville Naval Hospital, Jacksonville, Florida, his physical and mental condition was as follows: Quiet and agreeable, no behavior indicative of a psychosis; he had some confusion of thought processes at times, had been becoming increasingly irritable for several months, and had definite memory defects; he is well oriented and denies delusions, hallucinations and illusions with none being elicited; his intellectual level is average, and no gross defects of judgment are noted; he had some vague complaints of headaches, dizziness and insomnia.

## XXV

On or about June 6, 1949, Petitioner's physical and mental condition was as follows:

*"General Appearance and Behavior:*

This 23-year-old white male patient appears resistive and complaints of pain from the front to the back on the left side at the junction of the ULQ and the LLQ of the abdomen. There is no digital tremor, but the palms of the hands are wet, and he further states that he is bothered with hyperdrosis. It is difficult to establish rapport with this individual because he resents authority.

*"Speech and General Activity:* There is no speech defect. His replies to questions are coherent and relevant. He is able to get about the hospital easily.

*"Mood:* He is amused and resentful because he was referred to the psychiatrist.

*"Mental Status:* He is oriented in all 3 spheres. There are no delusions or hallucinations elicited. There are no ideas of reference expressed. There are no persecutory trends developed. He claims that he gets along well with others.

*"Memory and Intelligence:* There is no demonstrable memory defect. He has better than average intelligence, and has completed over 2 years of college.

"*Insight and Judgment:* He has good insight into his condition. His judgment appears to be adequate.

"*Neurological Examination:* Normal psychological reflexes.

"*Impression:* Hypochondriacal reaction."

### XXVI

On or about June 17, 1954, shortly after Petitioner was admitted to the United States Penitentiary at Terre Haute, Indiana, Petitioner had "normal affect, mood and memory and was mentally competent."

### XXVII

That Petitioner was mentally competent to understand the proceedings against him and to effectively assist in his own defense: at all times when he was examined by the three psychiatrists appointed; when he appeared in Court on December 15, 1955, December 20, 1955, February 6, 1956, March 26, 1956, March 29, 1956, April 6, 1956, June 6, 1956, and on July 5, 1956; on April 9, 1956, when he gave the statement to the agents of the Federal Bureau of Investigation; on April 11, 1956, when he re-enacted the killing of the victim Lindberg at the scene of the crime near Clear Lake, Sherburne County, Minnesota; and at all times during the proceedings against him in the United States District Court, District of Minnesota, in Case No. 8746 Criminal.

### Conclusions of Law

That the Petitioner, James Peter Taylor, was mentally competent at all times during all of the proceedings against him in the United States District Court, District of Minnesota, in Criminal No. 8746.

That the Court had jurisdiction to render the judgment it entered in Criminal No. 8746.

That the sentence imposed in Criminal No. 8746 was authorized by law and is not open to collateral attack.

That there was no denial or infringement of any constitutional right of Petitioner in any of the proceedings in Criminal No. 8746.

That Petitioner's Motion to Vacate and Set Aside the Sentence should be, and is, denied.

### Exhibit "A"

Statement of James Taylor to the Court at Time of Sentencing

The Court: Mr. Taylor, have you anything to say before the Court pronounces sentence?

The Defendant: Yes, Your Honor.

The Court: Am I now being handed, Mr. Nemerov, the Statement Mr. Taylor is now going to make to me?

Mr. Nemerov: An exact copy made in his own words.

The Court: Very well.

The Defendant: No one could be, or feel, more remorseful about Mr. Lindberg's death than I.

I well realize that my feeling remorseful cannot bring Mr. Lindberg back. The only way I can attempt to show my sorrow and remorse at this time is by trying to clear the record, once and for all, as to Kenneth Lindberg's complete innocence.

I had never known or met Kenneth Lindberg until the day of the crime, when I was with him for approximately eight hours. I can only say that during that eight hours I came to know and regard Mr. Lindberg as both a fine and honorable man.

The whole scheme and plan of the bank and Thief River Falls was given to me by a fellow inmate while I was in the Federal Penitentiary at Terre Haute, Indiana. Since this man was familiar with the area in which the crime took place, it was this information which made it possible.

Mr. Lindberg died a hero. He went along with me, not for any fear of his own welfare, but instead for fear of his family's safety.

I can only add that I sincerely wish it were Mr. Lindberg who had survived and not myself.

Your Honor, many times in the past eleven years I have felt a vital need for psychiatric help. I had asked for this help long before I had gotten into any difficulties or even contemplated committing any kind of a crime; during the time I was in Federal penal institutions, I often submitted written requests for psychiatric aid. All this was to no avail, as to date I have never been given any psychiatric help whatsoever."

Part of the reason for this being that there has never been one single psychiatrist in attendance at any penal institution where I was imprisoned. Yet the Federal Penitentiary at Terre Haute, Indiana, where I served a two-year sentence is one of the larger Federal penal institutions in America today.

I might add here that neither have I ever been given an opportunity or chance to make good under the supervision and guidance of either probation or parole.

The United States Government has spent an enormous amount of money, both in my apprehension and in the litigation necessary to bring me where I stand before Your Honor today. Just a minute fraction of all this money spent to date, directed toward psychiatric help for me in the past, could well have prevented this whole thing from ever happening.

I cannot help but think that possibly had this help been available and offered me, that I would not be standing here before you and that possibly Kenneth Lindberg would be alive today.

Your Honor, I feel that I need that psychiatric or mental help today, as much, if not more than I have ever needed it in the past. It is my sincere hope that if Your Honor sees fit to spare my life, that I will be given that psychiatric help in the future which I have both needed and wanted so badly in the past.

It too is my hope that possibly through receiving such help in finding out and possibly correcting what is wrong with me; those things which have caused or contributed to my facing Your Honor under the circumstances today, that perhaps others like me can be helped in the future, before they too make a shambles, not only of their own lives, but of the lives of others as well.

I do not ask or want this just for my sake alone, nor do I want it only for the sake of those afflicted by mental problems similar to my own. Rather, I want this also for the sake of other Kenneth Lindbergs, families like the Lindbergs and society as a whole.

In conclusion, I want to thank Your Honor and this Court for all the fairness and consideration it has shown me, regardless of any punishment to be meted out.

I, too, would like to thank His Honor and this Court for appointing me two such conscientious and capable attorneys who have truly demonstrated the American way in spirit as well as in fact. These men have done everything in their power to protect my rights and at the same time to see justice done.

In closing I will only ask that if Your Honor sees fit to spare my life, that he will include a recommendation for psychiatric or mental help for me. Thank you.

Exhibit "B"

May 21, 1956

The Honorable Gunnar H. Nordbye
Judge, United States District Court,
Federal Court House
Minneapolis, Minnesota

Dear Judge Nordbye,

Pursuant to the order of your Court, we have made neuropsychiatric evaluation of James Peter Taylor.

Our conclusions were reached after interviewing Taylor for five hours; reviewing information given us by the Department of Justice; reviewing hospital records; making a detailed neurological examination and completing two electroencephalograms. We also made a psychiatric evaluation. The total time consumed was approximately 10 hours or more.

The conclusions are as follows:

1) The objective clinical neurological examination is negative. There are no neurological residuals of any intracranial injury or brain injury.

2) The two electroencephalograms are entirely normal. They show no residuals of any brain injury or residual brain damage.

3) The psychiatric examination shows no evidence of any mental or intellectual impairment such as would be indicative of residuals of intracranial or brain injury.